**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LORRAINE R. FRANZI,                          )
                                             )
            Plaintiff,                       )
                                             )        Civil No. 12-1432
      v.                                     )        Judge Nora Barry Fischer
                                             )
UPMC PRESBYTERIAN SHADYSIDE,                 )
                                             )
            Defendant.                       )

## MEMORANDUM OPINION

Plaintiff Lorraine R. Franzi ("Franzi") brings this civil rights action under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA") against Defendant UPMC Presbyterian Shadyside ("UPMC"). (Docket No. 19). Franzi alleges disability discrimination, retaliation, and failure to promote under the ADA. *Id.* UPMC filed a Motion for Summary Judgment arguing no liability on all counts. Said Motion is now fully briefed. (Docket Nos. 27, 29, 30, 32, 35, 38, 39, 41, 43, 46). Upon consideration of the parties' filings, their arguments presented at the March 20, 2014 Motion Hearing,[1] (Docket No. 40), their supplemental materials,[2] (Docket No. 41, 43, 46), and for the reasons more fully stated herein, Defendant's Motion, (Docket No. 27), is GRANTED, in part, and DENIED, in part.

## I.     BACKGROUND[3]

Franzi suffers from depression and severe anxiety, dating back to 1980.[4] Franzi Dep. 31:8-22, (Docket No. 28-1 at 13). On March 7, 2005, she began working at UPMC as a dietician

---

[1] Neither party requested preparation of the transcript from the Motion Hearing. (Docket No. 40).
[2] Given the parties' citations to several documentary materials that were not filed in tandem with their original motion papers, the Court ordered the parties to file these materials on the docket as supplemental appendices. (Docket Nos. 40, 42). These supplementary materials were filed on May 1-2, 2014. (Docket Nos. 43, 46).
[3] The facts are viewed in the light most favorable to the Plaintiffs, as this case comes before the Court on Defendants' Motion for Summary Judgment. *See, e.g.*, *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where no genuine issue of material fact exists, and where, viewing the facts in the light most favorable to the party against whom summary judgment was entered, the moving party is entitled to judgment as a matter of law.").

specialist and Certified Nutrition Support Clinician ("CNSC"). Franzi Dep. 9:24-10:1, (Docket No. 28-1 at 7-8). Currently, she cannot work due to agoraphobia.[5] (Docket No. 29 at 18). Consequently, she has been receiving disability benefits under the Social Security Act since July 2013. Franzi Dep. 28:3-29:3, (Docket No. 28-1 at 12).

Franzi was interviewed and hired by Kelly Danis ("Danis"), Manager of Nutrition[6] at UPMC's Presbyterian campus,[7] who became her immediate supervisor.[8] Danis Dep. 18:3-21, (Docket No. 28-7 at 7). One reason that Danis hired Franzi was her CNSC certification and her experience[9] in writing Total Parenteral Nutrition ("TPN") Orders.[10] Danis Dep. 18:3-21, (Docket No. 28-7 at 7). From 2005 to 2007, Franzi did not have any problems at UPMC, and her disability did not affect her work performance.[11] (Docket No. 40). However, starting in 2007, Franzi began receiving disciplinary write-ups and marginal performance ratings in teamwork and communication. (Docket No. 28-2 at 25-27, 50, 62-63, 73-76, 82, 93). She also took several extended leaves of absence in 2008, 2009, 2011, and 2012. (Docket No. 29 at 4).

---

[4] Given the nature of this case, the numerous disputed issues of fact, and the parties' citations to the deposition testimony of the individuals involved in this case, the Court cites to deposition testimony provided by the parties in the appendices attached to their motion papers. (Docket Nos. 28, 32, 41, 43).

[5] "Panic disorder with agoraphobia is an anxiety disorder in which a person has attacks of intense fear and anxiety. There is also a fear of being in places where it is hard to escape, or where help might not be available." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001921/.

[6] Nutrition is one of four areas within UPMC's Food and Nutrition Department, and parenteral nutrition specialists fell within a subset of clinicians in the clinical nutrition area. Danis Dep. 8:19-9:2, (Docket No. 28-7 at 4).

[7] According to Simone Frerk, the Executive Director of Food and Nutrition at UPMC, the nutrition department is a subset of the food and nutrition department, and there are two locations, a Presbyterian one and a Shadyside one. Frerk Dep. 9:15-17, 10:21-12:2, (Docket No. 28-5 at 4-5). Danis was Manager of Nutrition at Presbyterian, while Jennifer Wilson was the corresponding Manager at Shadyside. Frerk Dep. 12:3-10, (Docket No. 28-5 at 5).

[8] Danis first met Franzi during Danis' internship with West Penn Hospital, while Danis was earning her bachelor's degree in 1990. Danis Dep. 4, 14, (Docket No. 28-7 at 2, 6). At that time, Franzi was a clinician in nutrition support service, and Danis served a rotation under Franzi for Danis' critical care rotation. Danis Dep. 14, (Docket No. 28-7 at 6). Franzi had been planning to move back to Pittsburgh to take care of her mother, and did so in January 2005. Franzi Dep. 237:10-18, (Docket No. 28-3 at 24). After taking care of her mother for several months, Franzi began working at UPMC on March 7, 2005. Franzi Dep. 237:10-18, (Docket No. 28-3 at 24).

[9] Prior to UPMC, Franzi worked as a clinician at the Cleveland Clinic for several years. Danis Dep. 18:3-21, (Docket No. 28-7 at 7).

[10] Parenteral is another word for intravenous. Franzi Dep. 10:19-23, (Docket No. 28-1 at 8).

[11] At the motion hearing in this case, counsel for UPMC conceded that for the first two years of her employment at UPMC, Franzi had no problems, and her first issue with her supervisor occurred in 2007. (Docket No. 40).

When Danis hired Franzi, she informed Franzi that she could potentially move into a lead role in teaching current dieticians, as the UPMC staff lacked experience in writing TPN orders,[12] and Franzi had more experience in same based on her prior work at the Cleveland Clinic. Danis Dep. 18:7-19:11, (Docket No. 28-7 at 7); Franzi Dep. 10:23-11:11, (Docket No. 28-1 at 8). When UPMC created the position of Dietician Coordinator ("2007 promotion") in March 2007, however, it was awarded to Jean Nickleach ("Nickleach"). (Docket No. 29 at 2). Nickleach thus reported to Danis and replaced Danis as Franzi's immediate supervisor. (Docket No. 29 at 2).

Danis testified that although Franzi had the most experience in writing TPN Orders, the Dietician Coordinator was responsible for supervising all dieticians, not just those who wrote TPN orders. Danis Dep. 40:23-41:7, (Docket No. 28-7 at 12). Nickleach did not have as much experience in the TPN process as Franzi, but she had "more experience with the general nutrition, general dietician work." Danis Dep. 42:9-14, (Docket No. 28-7 at 13). Danis made the final decision to hire Nickleach as the Dietician Coordinator, with input from Joyce Scott-Smith ("Scott-Smith"), the Director of the Food and Nutrition Department. Danis Dep. 41:11-16, (Docket No. 28-7 at 12). She chose Nickleach based on her "more global experience in all of the functions of the clinical nutrition area," and the fact that Nickleach had already served in a "lead dietician" role since 2005. Danis Dep. 41:19-42:5, (Docket No. 28-7 at 12-13).

Concurrently, Franzi experienced a severe bout of depression following her 2007 annual review, wherein she received an overall rating of 2.48 from Danis (on a scale of 1-3), which rating Franzi attributed to "lies."[13] (Docket Nos. 28-1 at 21; 28-2 at 10; 32 at 3). According to Franzi, these "lies" were not contained in the performance review, but were verbally transmitted

[12] The two main duties of CNSCs were TPN orders and Intensive Care Units ("ICUs"). (Docket No. 29 at 2).
[13] In her prior review in March 2006, Franzi had received an overall rating of 2.58, which was rounded up to three, i.e., "consistently exceeds expectations." (Docket No. 43-2 at 1). In the 2006 review, Danis had crossed out a rating of 2.5 for Teamwork and replaced it with a rating of 3. (Docket No. 43-2 at 8).

during the review.  Franzi Dep. 86:10-92:3, (Docket Nos. 28-1 at 27-28).  Franzi's March 2007 review rounded down to 2, i.e., "consistently meets expectations."  (Docket No. 28-2 at 10).

In subsequent reviews, Franzi continued to receive overall ratings of 2, which corresponded to "Solid, Strong, Good Performer."[14]  (Docket Nos. 28-2 at 18, 37, 61, 71, 82). Prior to 2009, Danis conducted Franzi's reviews.  (Docket No. 28-2 at 17, 24).  Starting in 2009, Nickleach conducted her reviews.  (Docket No. 28-2 at 49).  Although Franzi signed her 2007 Performance Review, (Docket No. 28-2 at 16), she refused to sign any subsequent performance reviews, (Docket Nos. 28-2 at 24, 49, 76, 84; 29 at 6; 32 at 5).  Franzi also submitted detailed comments disputing her ratings on teamwork and communication.  (Docket No. 28-2 at 25-27, 50, 62-63, 73-76, 82).  Nickleach reduced Franzi's annual 3% salary raise by one-half in 2009 and 2010.  (Docket No. 28-2 at 9, 17, 38, 63); Franzi Dep. 95:18-96:7, (Docket No. 28-1 at 29).

In light of her bout of depression in 2007, Franzi applied for and received medical leave under the Family and Medical Leave Act ("FMLA") and short term disability payments from UPMC in April 2007.  (Docket No. 32 at 4); EEOC Complaint, (Franzi Dep. Ex. 56).  Franzi never discussed her disability with her supervisors, Franzi Dep. 43:3-6, (Docket No. 28-1 at 16), and she did not believe that anyone knew about her medical condition prior to July 2007, Franzi Dep. 62:16-19, (Docket No. 28-1 at 21).  Despite same, when she first went on FMLA leave in 2007, Scott-Smith sent an email to Danis on April 19, 2007 stating, "Can't wait to hear … STD?? Mental??"  (Docket No. 32-2 at 1).  A physician assistant, Denise Keriotis ("Keriotis"), also apparently called Franzi "crazy" and warned Franzi not to go crazy again on her.  Franzi Dep. 46:11-49:16, (Docket No. 28-1 at 17).  Franzi subsequently took several extended leaves of

---

[14] In her declaration, Kathy Grills, a Manager of Human Resources at UPMC Presbyterian Shadyside, affirmed that Franzi was rated a marginal performer, Grills Decl. ¶ 21, (Docket No. 28-10 at 5), but that is incorrect, as Franzi's overall rating was "Solid, Strong, Good Performer" throughout 2010-2012.  (Docket Nos. 28-2 at 61, 71, 82). Franzi received ratings of marginal performer only within certain subcategories of her performance reviews throughout this period. *Id.* at 53-83.

absence in 2008, 2009, 2011, and 2012, as well as many days of intermittent leave. (Docket No. 29 at 4). All of these leaves were approved by UPMC. EEOC Complaint, (Franzi Dep. Ex. 56).

According to Kathy Grills ("Grills"), a Manager of Human Resources at UPMC Presbyterian Shadyside, UPMC WorkPartners was supposed to handle employee FMLA and disability leave requests, as well as requests for accommodations due to disabilities, and all medical information was to be provided confidentially to UPMC WorkPartners. (Docket No. 28-10 at 5). No information was to be given to supervisors or Human Resources other than information about restrictions on an employee's ability to work or necessary accommodations. (Docket No. 28-10 at 5).

When Franzi returned from her first FMLA medical leave on July 2, 2007, however, Danis requested her return to work authorization. Danis Dep. 26:1-27:2, (Docket No. 28-7 at 9). Although she was willing to provide same, Franzi did not wish to disclose that she had been treated at the Western Psychiatric Institute and Clinic ("WPIC"). Franzi Dep. 35:1-16, (Docket No. 28-1 at 14). Danis called Human Resources to request the authorization, which they faxed to Danis on June 28, 2007. Franzi Dep. 38:18-39:21, (Docket No. 28-1 at 15); Danis Dep. 26:1-27:2, (Docket No. 28-7 at 9). As a result, both Danis and Scott-Smith improperly received her return-to-work authorization, which stated that Franzi had been treated at WPIC in the "Mood and Anxiety Intensive Outpatient and Partial Programs." (Docket No. 28-2 at 2); Danis Dep. 26:24-27:17, (Docket No. 28-7 at 9). Human Resources then called Danis to ask if she had received a copy of the return-to-work form and to destroy it, because its dissemination was a Health Insurance Portability and Accountability Act ("HIPAA") violation. Danis Dep. 27:19-28:1, (Docket No. 28-7 at 9). Danis later testified that she never told anyone that Franzi had treated at WPIC until after Franzi's filing of her Equal Employment Opportunity Commission

("EEOC") Complaint in January 2012. Danis Dep. 28:16-29:10, (Docket No. 28-7 at 9); (Docket No. 46 at 9).

Following this incident in July 2007, Franzi filed a complaint with UPMC Corporate Compliance asserting a HIPAA violation, as Human Resources had allegedly advised Danis that she had not done anything wrong. Franzi Dep. 41:3-42:20, (Docket No. 28-1 at 15-16). The HIPAA violation was never resolved, as the Corporate Compliance official determined that it was not UPMC's responsibility, but UPMC WorkPartner's responsibility. Franzi Dep. 42:23-43:8, (Docket No. 28-1 at 16). Yet, when Franzi contacted the director of UPMC WorkPartners, she was informed that UPMC was "in transition," so Human Resources still had her papers. Franzi Dep. 43:8-19, (Docket No. 28-1 at 16). Franzi again spoke with Human Resources, after which they indicated they would flag her papers to make sure no one saw them, but Franzi maintains that the damage was already done. Franzi Dep. 43:19-23, (Docket No. 28-1 at 16).

Meanwhile, on September 5, 2008,[15] Franzi received "Verbal Counseling" for violating the UPMC Code of Conduct, after an incident in which Franzi supposedly did not identify herself fully to a nurse practitioner and two doctors. (Docket No. 28-2 at 93). Franzi repeated several times that she was "Lorraine from GI Nutrition," but the doctors were evidently unable to determine if Franzi was a doctor, nurse, or pharmacist, etc., as Franzi did not identify herself as a

---

[15] Prior to this, a written warning was issued to Franzi on September 18, 2007 for "Failure to follow Departmental Policies or work rule." (Docket No. 28-2 at 88). Franzi, however, maintains that she never received this warning. Franzi Dep. 104:24-105:20, (Docket No. 28-1 at 31). This warning was also not signed by Franzi or her supervisor. (Docket No. 28-2 at 89). According to the warning, Franzi had been advised that "[p]atient care was jeopardized by failing to maintain communication, lack of covering pager when on call, by not acknowledging or making an attempt to complete a consult within the required 24 hours and lack of communication to team members regarding the outstanding consult." (Docket No. 28-2 at 88). On September 16, 2007, the "TPN pager was not covered by Lorraine Franzi who was scheduled to be on call for those days" and "an ordered consult was not acknowledged within 24 hours." (Docket No. 28-2 at 88). For the violation, Franzi received a "Written Warning" under Hospital Policy HS HR-0704, Corrective Action and Discharge, and was informed that "[o]ngoing violation of such standards will result in further corrective action up to and including termination of employment." (Docket No. 28-2 at 88).

dietician.[16]  (Docket No. 28-2 at 93).  Franzi refused to sign the acknowledgement of the related

verbal warning, which stated that "[a]ny other violation of Hospital or Departmental Policies or

Procedures will result in additional corrective action up to and including termination of

employment."  (Docket No. 28-2 at 93).  The verbal warning appears to have been the first step

in a four-step corrective action process, including: (1) verbal counseling, (2) written warning,

(3) suspension for three days, and (4) termination.[17]  (Docket No. 28-2 at 93).

Six months later, Franzi received a "Written Warning for Inappropriate Communication

with her Supervisor, which bordered on Insubordination," for her refusal to acknowledge

Nickleach's authority to check on her work.  (Docket No. 28-2 at 97).  Franzi refused to sign the

acknowledgment of the Warning, which also stated that it was the second step in the UPMC

corrective action process.  (Docket No. 28-2 at 97).  The Warning stated that if Franzi "fail[ed] to

demonstrate immediate and sustained improvement or further violate[d] hospital/departmental

policy, practice or procedure," she would "advance in the Corrective Action process, up to and

including termination from employment."  (Docket No. 28-2 at 97).  It also encouraged Franzi to

review Policy HS-HR0704, Corrective Action and Discharge,[18] to understand UPMC's

corrective action process and her rights and responsibilities. (Docket No. 28-2 at 97).

In late May 2009, Franzi received yet another written warning: a "Written Warning in

Lieu of 3 Day Suspension," for using pre-signed TPN order sheets, which violated Policy CP47,

Evaluation of Nutrition Support Patients.[19]  (Docket No. 28-2 at 98).  Although this Warning did

not include the Corrective Action checklist, it listed the prior warnings that Franzi had received

---

[16] In this Court's estimation, after viewing the facts in the light most favorable to Franzi, if Franzi had been a doctor, you might expect that her colleagues would recognize her and her role.

[17] A review of UPMC's Corrective Action and Discharge Policy HS-HR0704 discloses four steps, which include: (1) supervisor counseling/verbal;     (2) written warning;     (3) suspension/final     written     warning;     and (4) discharge/suspension pending investigation.  (Docket No. 46 at 15-19).

[18] See note 17, supra.

[19] This policy stated: "TPN specialist will write initial TPN order, obtain TPN safety Team/NSS attending Physician approval and signature then send to Pharmacy."  (Docket No. 28-2 at 98).

in September and November, 2008. (Docket No. 28-2 at 98). It also stated that under UPMC Policy HS-HR0704, Corrective Action and Discharge, Franzi was "receiving a written warning in lieu of a 3 day suspension," and "[a]ny additional violation of UPMC policy will result in further corrective action up to and including termination of employment at UPMC." (Docket No. 28-2 at 98). It further advised Franzi that she could file a grievance within seven (7) calendar days with the Grievance Committee of Human Resources.[20] (Docket No. 28-2 at 98). As with the prior warnings, Franzi refused to sign this Warning. (Docket No. 28-2 at 98).

Franzi later testified that this Warning was a result of what she termed a "class action," in which all the CNSCs had been disciplined for using pre-signed forms, including Lisa Gannon ("Gannon"), because physicians had requested that CNSCs use pre-signed forms, and they were caught in between management and the physicians. Franzi Dep. 61:5-18, (Docket No. 28-2 at 20). Danis acknowledged that this Warning had been given to all "clinicians, managers and supervisors" because "everyone was using presigned TPN order sheets," and "Franzi was just following the policy that everybody else was using." Danis Dep. 73:15-25, (Docket No. 28-7 at 20). Franzi testified that the clinicians wrote a collective grievance to Human Resources, but they did not hear back from Human Resources. Franzi Dep. 109:2-20, (Docket No. 28-1 at 32).

Almost a year later, Franzi received a "Final Written Warning in Lieu of 5 Day Suspension," for her "failure to improve her job performance and conduct, after numerous corrective steps have been taken." (Docket No. 28-2 at 102). She was accused of bypassing "the GI Nutrition staff member who was assigned to approve and sign TPN orders" by going "directly to the Physician attending for order approval." (Docket No. 28-2 at 102). This Warning detailed the three prior warnings she had received since September 2008, and stated: "[f]urther violation

_____

[20] The Written Warning also suggested Life Solutions for confidential counseling. (Docket No. 28-2 at 98). The parties did not define Life Solutions in their briefing before the Court or during oral argument, but it appears to be an internal program at UPMC to assist employees with counseling. (Docket No. 40).

will result in additional corrective action up to and including termination of employment" and that the "next step in the corrective action process is termination of employment." (Docket No. 28-2 at 102). When she received this Warning, she again refused to sign. (Docket No. 28-2 at 102). Instead, she filed a grievance on March 26, 2010 requesting that the Final Warning be overturned. (Docket No. 28-2 at 108). Even though Human Resources Vice President Louis Goodman ("Goodman") assured her that he would not tolerate any retaliation, Franzi canceled her April 2010 grievance appointment based on fear of retaliation.[21] (Docket No. 28-2 at 110).

To place this Warning in context, Danis testified that no other CNSCs had ever had a situation in which it was easier or faster for the physician to sign the orders rather than wait for the nurse practitioner. Danis Dep. 81:14-18, (Docket No. 28-7 at 22). Danis did acknowledge, however, that UPMC changed its procedure in 2007, several years after Franzi had already begun working at UPMC, from a system in which CNSCs were working one-on-one with physicians to write TPN orders, to one in which they worked with physician assistants rather than the physicians, before going to the physicians. Danis Dep. 21:3-22:19, (Docket No. 28-7 at 8).

Meanwhile, Franzi engaged counsel[22] and on July 6, 2011, counsel sent a letter to Goodman[23] containing seven workplace accommodation requests. (Docket No. 28-2 at 5). Additionally, Franzi's physician, Dr. Alexandra Kreps, sent UPMC a letter dated July 5, 2011

---

[21] According to a UPMC file memorandum on April 29, 2010, "Lorraine Franzi was originally scheduled for her grievance meeting on 4/22/10 with Lou Goodman. Lorraine called on 4/19/10 to say that she was afraid to meet with Lou because she was afraid of retaliation from her department. Lou returned Lorraine's call the next day and assured her that he would not tolerate that kind of behavior from the department. She called back and her meeting was rescheduled for 4/27/10 at 3:30pm." (Docket No. 28-2 at 110). However, on April 27, 2010, Franzi called and left a voicemail, stating, in pertinent part: "As you well know, last week I had called and said that I wanted to speak with Mr. Goodman regarding the grievance. I'm sorry that I am just too concerned about retaliation at this point and although I do trust Mr. Goodman that he would not allow that to happen, I'm just involved in something that I just…I'm too concerned. So, I wanted to tell you to tell him thank you for his time and that I will not be meeting with him today." (Docket No. 28-2 at 110).

[22] Counsel for Franzi represented at oral argument that he was first retained by Franzi in July 2011, as Franzi was returning from her fourth medical leave. (Docket No. 40).

[23] As previously noted, Mr. Goodman was a Human Resources Vice President at UPMC, and the contact person for Franzi's March 26, 2010 grievance against her Final Written Warning. (Docket No. 28-2 at 110).

requesting: (1) that Franzi be placed on a four day, ten-hours-per-day schedule; (2) that she be placed in a calm and supportive working environment; and (3) that any concerns about her work be addressed by only one person rather than a group of people. (Docket No. 32-2 at 2). As such, Dr. Kreps supported Franzi's counsel's additional recommendations. (Docket No. 32-2 at 2).

Approximately three weeks later, Franzi met with Grills[24] concerning Franzi's request to extricate her prior warnings from her Human Resources record. (Docket No. 28-2 at 121). Two days after her meeting, Franzi sent a follow-up email thanking Grills and expressing optimism in achieving the workplace accommodations that Franzi, her lawyer, and her doctor had requested. (Docket No. 28-2 at 121). The next day, UPMC WorkPartners sent via fax a follow-up questionnaire to Dr. Kreps asking whether: (1) Franzi could work for five consecutive days; (2) whether she could work any shift time; (3) her preferred shift times; (4) the number of hours per day that she could work; (5) specific recommendations for the requested "calm, supportive work environment"; and requesting (6) any additional recommendations for UPMC in dealing with supervision, communication, and frustration/anxiety within the normal chain of command. (Docket No. 32-2 at 3). Six weeks later, Dr. Kreps confirmed that Franzi could work only four days per week, during daylight hours, with ten-hours-per-day shifts, supportive rather than critical supervisors, and "1 on 1" communication so that she "doesn't feel ganged up on." (Docket No. 32-3 at 3). However, on October 18, 2011, Dr. Kreps sent a follow-up letter to UPMC indicating that although she had confirmed Franzi's workplace accommodations with UPMC in August 2011 and again on September 15, 2011, she received no response from UPMC, nor did Franzi receive her requested workplace accommodations.[25] (Docket No. 32-2 at 1).

---

[24] Grills, as noted, is a Manager of Human Resources at UPMC Presbyterian Shadyside.
[25] One year later, on August 30, 2012, Dr. Kreps revised Franzi's accommodation request, replacing the words, "calm and supportive environment," with "previous working environment," and requesting that Franzi be placed on a three-consecutive-day, eight-hours-per-day schedule. (Docket No. 32-2 at 4).

Danis testified that she had never seen Franzi's July 6, 2011 accommodation requests nor did she speak with Goodman or an in-house attorney about these requests. Danis Dep. 29:15-30:6, (Docket No. 28-7 at 9-10). But, Danis did discuss Franzi's return-to-work accommodations following her leaves of absence. Danis Dep. 30:13-24, (Docket No. 28-7 at 10). According to Danis, there had "never been anyone in the clinical nutrition department on a four, [sic] ten hour a day schedule," despite five or six requests for that schedule, because their "work flow does not support a four day workweek" due to their "seven day a week coverage," Danis Dep. 32:7-12, 33:5-17, 33:20-34:7, (Docket No. 28-7 at 10-11).

Thereafter, Franzi submitted to Grills a formal complaint with six examples of alleged harassment. (Docket No. 28-10 at 7-15). Even though Franzi described these incidents in extensive detail, Grills declared[26] that she dismissed her complaints, (Docket No. 28-10 at 7-15), finding them meritless. Grills Decl. ¶ 6, (Docket No. 28-10 at 3). Before doing so, Grills investigated Franzi's complaints and "spoke with her supervisors and any other necessary witnesses." Grills Decl. ¶ 8, (Docket No. 28-10 at 3). She affirmed that she informed Franzi in early August 2011 that she found her July 2011 complaints unsubstantiated, but she cites no

---

[26] Pursuant to Federal Rule of Civil Procedure 56, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials … An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c); *see also United States v. 225 Cartons, More or Less of an Article or Drug*, 871 F.2d 409, 414 n.4 (3d Cir. 1989) ("These [declarations] were filed under penalty of perjury pursuant to 28 U.S.C. § 1746 (1982) and thus satisfy the affidavit requirement of Rule 56."). However, the Third Circuit has recognized that "'[t]he deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination.'" *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). "Inherently depositions carry an increased level of reliability." *Id.* "Depositions are adversarial in nature and provide the opportunity for direct and cross-examination." *Id.* "Affidavits, on the other hand, are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible." *Id.* The Court is also mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

documentary evidence to support her declaration. Grills Decl. ¶ 5, (Docket No. 28-10 at 2). She also could not recall whether she informed Franzi of her findings concerning her August 2011 complaints. Grills Decl. ¶ 9, (Docket No. 28-10 at 3). Subsequently, she authorized the September 12, 2011 "Written Warning in Lieu of a 5 Day Suspension."[27] Grills Decl. ¶ 10, (Docket No. 28-10 at 3). (Yet, Danis later testified that Grills actually recommended that Franzi be terminated for this incident. Danis Dep. 90:1-26, (Docket No.28-7 at 25).)

This Warning accused Franzi of taking a packet of patient-confidential emails to Kopy Kat[28] to be bound, without prior authorization.[29] (Docket No. 28-2 at 111-15). It documented her prior warnings on September 5 and November 11, 2008, May 29, 2009, and March 9, 2010. (Docket No. 28-2 at 111). And it warned that failure to demonstrate immediate and sustained improvement or further violations could lead to termination from employment pursuant to HS-HR0704, Corrective Action and Discharge, and that it was a repeat of the "written warning in lieu of 5 day," but it <u>did</u> <u>not</u> <u>state</u> that termination was the next step,[30] as did the prior warning on

---

[27] The Authorization Form appears to require a signature from a Human Resources Representative and approval from Human Resources, the Department Head, and a Vice President. (Docket No. 28-2 at 113). The Human Resources Representative for the prior Final Written Warning was Rachel Cupcheck. (Docket No. 28-2 at 103). The Authorization Form's description of the incident states that the manger cautioned Franzi "to not remove the packet of papers from the building since it contained patient information." (Docket No. 28-2 at 114). Franzi's email to Grills, however, suggests that the packet never left the building. (Docket No. 28-2 at 116).

[28] According to the Warning itself, the "Kopy Kat" facility was an "outside business." (Docket No. 28-2 at 111). Franzi's email to Grills describing the circumstances surrounding this incident attempts to rebut that fact in that "Kopy Kat" was "on Scaife floor 2," which is located within the hospital building. (Docket No. 28-2 at 116).

[29] The Court notes that in 2008, the Sixth Circuit established a six-factor test to evaluate whether "employees deserve protection when they make reasonable attempts to preserve evidence of illegal employment practices, including discrimination and retaliation." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 727 (6th Cir. 2008). These factors were as follows: "(1) how the documents were obtained, (2) to whom the documents were produced, (3) the content of the documents, both in terms of the need to keep the information confidential and its relevance to the employee's claim of unlawful conduct, (4) why the documents were produced, including whether the production was in direct response to a discovery request, (5) the scope of the employer's privacy policy, and (6) the ability of the employee to preserve the evidence in a manner that does not violate the employer's privacy policy." *Id.* at 726; *see also Smith v. Chicago Transit Auth.*, Civ. No. 12-8716, 2014 WL 3892233, *10 (N.D. Ill. Aug. 5, 2014) ("Consequently, there remain genuine issues of material fact as to whether Mr. Smith's disclosing the documents was a protected activity, and thus, whether CTA's admission that it terminated Mr. Smith on this ground (and on his failure to cooperate in CTA's investigation into the disclosures) constituted retaliation.").

[30] Danis acknowledged that Franzi's March 19, 2010 Final Written Warning would have expired after eighteen (18) months, or on September 19, 2011. Danis Dep. 89:9-13, (Docket No. 28-7 at 24).

March 19, 2010. (Docket No. 28-2 at 111). Franzi signed the September 2011 Warning, but she wrote that she did not agree to its contents. (Docket No. 28-2 at 111-12).

Franzi filed a grievance challenging this Warning on September 19, 2011, asserting that she did not exhibit poor judgment or improperly handle patient information, because she guarded the packet closely and was extremely sensitive to patient privacy, in light of the previous disclosure of her own treatment at WPIC. (Docket No. 28-2 at 122-24). She also maintains that there was a cover sheet to prevent exposure of patient information, and "not once did it leave [her] eyes." (Docket No. 28-2 at 124). She relies on UPMC's Privacy Officer Guidelines, Franzi Dep. 52:1-21, (Docket No. 28-1 at 18), which state that disclosure of Protected Health Information is not a reportable breach if "there is a good faith belief that the unauthorized person would not reasonably have been able to retain the information," (Docket No. 41-4 at 2).

Before Franzi received the Written Warning, she also sent Grills an email describing the events that occurred in September 2011 as another example of harassment by Danis. (Docket No. 28-2 at 116). Franzi's grievance was denied by the Manager of Human Resources at UPMC Presbyterian Shadyside, Laura J. Zaspel ("Zaspel"), on November 11, 2011. (Docket No. 28-2 at 125-26). Zaspel noted that because Franzi's most recent corrective action in March 2010 was a written warning in lieu of five (5) day suspension, the next step in the corrective action process was termination; however, Franzi received yet another written warning in lieu of five (5) day suspension. (Docket No. 28-2 at 125-26). Franzi then appealed this decision to the President of UPMC Presbyterian Shadyside, John Innocenti. On January 23, 2012, after reviewing Franzi's file and meeting with her and other individuals, he denied her grievance and upheld the written warning in lieu of five day suspension. (Docket No. 28-2 at 127).

Four and a half months later, Franzi sent an email[31] to Danis containing the words, "No threat." In response, Danis sought guidance from Emily T. Bowman[32] ("Bowman"), Frerk, and Grills. (Docket No. 28-2 at 128). They recommended that Danis provide Franzi with verbal counseling and document the incident. (Docket No. 28-2 at 128). Danis then met with Franzi on June 14, 2012, (Docket No. 28-2 at 132), though Franzi denied that this meeting ever occurred, Franzi Dep. 138:16-139:6, (Docket No. 28-1 at 40). Franzi also submitted an email complaint to Grills on June 19, 2012, writing that Danis forced her to attend another "gang-up" meeting, in which Danis brought in a "cafeteria supervisor" to join the meeting despite her request that the meeting be conducted one-on-one with Danis, and her prior workplace accommodation request against "gang-up" meetings. (Docket No. 28-4 at 35). Franzi also complained that Nickleach scheduled Franzi for both the week directly before and directly after her vacation despite her advance request not to be assigned to those weeks. (Docket No. 28-4 at 35). Franzi testified that Danis agreed that this scheduling was a "bit much" and allowed her to find another clinician to cover those weeks. Franzi Dep. 167:12-168:14, (Docket No. 28-3 at 7).

In October and November 2012, Franzi submitted additional formal complaints to Grills,[33] (Docket No. 28-4 at 2-5, 35-58):

- Her first complaint was against Meredith Ponczak ("Ponczak"), another clinician, for not following established communication protocols and for horizontal violence[34] against Franzi. (Docket No. 28-4 at 3-5).

---

[31] Franzi's email was written in response to Danis' investigation of an email complaint from Dr. Carol Regueiro, who had witnessed a telephone conversation in which Franzi apparently yelled at another dietician, Meredith Ponczak, and who had received complaints from Keriotis of similar instances. (Docket No. 28-8 at 21).

[32] Danis' email was sent to Bowman, Frerk, and Grills, but the email does not provide further clarification concerning Bowman's title or responsibilities within UPMC. (Docket No. 28-2 at 128).

[33] Franzi also filed the Complaint in this case on October 3, 2012. (Docket No. 1).

[34] Horizontal violence is a term of art used by UPMC as a formal phrase for "bullying." Franzi Dep. 200:22-201:3, (Docket No. 28-3 at 15).

- Her second complaint was against Nickleach for stripping Franzi of her prior leadership role concerning Medical Intensive Care Unit lectures.[35] (Docket No. 28-4 at 37-39).
- Her third complaint was against Danis and Simone Frerk ("Frerk"), the Executive Director of the Food and Nutrition Department at UPMC, for bullying, ganging up on, and threatening Franzi concerning a personal invitation by a physician to Franzi to participate on a parenteral nutrition project. (Docket No. 28-4 at 51-54).
- Her fourth complaint was against Danis for improper and complete lack of communication relating to an incident that occurred between Franzi and Keriotis in October 2012.[36] (Docket No. 28-4 at 55-56).
- Her fifth complaint was against Danis for improper communication relating to the "Nutrition Support Guidelines for Parenteral and Enteral Nutrition" booklet. (Docket No. 28-4 at 57-58).

After exchanging several emails over Franzi's upcoming performance review, Franzi wrote on November 2, 2012 that she was mentally unable to sit across from two people who "demean" her and "discredit" her integrity, and that the "five to seven years of this type of inappropriate behavior has damaged [Franzi] enough." (Docket No. 28-4 at 8). Grills responded by stating that "should [Franzi] continue to attempt to direct [her] own performance management or should [she] file any further complaints concerning [her] supervisors' reasonable management of [her] performance, [she] shall be subject to corrective action, up to and including termination." (Docket No. 28-4 at 17). Grills underscored that Franzi had not requested an accommodation or provided medical documentation that would preclude her from participating in her evaluation, as scheduled, apparently unaware of Franzi's 2011 request[37] by her attorney and her doctor that her performance reviews or other concerns be addressed in one-on-one sessions, preferably with Danis, rather than in a group. (Docket Nos. 28-2 at 5; 32-2 at 2). In

---

[35] On October 26, 2012, Danis acknowledged that Franzi had been responsible for the Medical Intensive Care Unit lectures and should resume this responsibility. (Docket No. 28-4 at 48).

[36] Keriotis also submitted a description of the October 2012 incident in the form of an email to Danis dated October 24, 2012. (Docket No. 28-8 at 23).

[37] As previously noted, Franzi had sent an email to Grills dated July 28, 2011 thanking Grills for the chance to meet with her and referencing her workplace accommodation requests. (Docket No. 28-2 at 121).

response, Franzi sent two emails on November 5, 2012 requesting clarification on whether she was now precluded from submitting formal complaints. (Docket No. 28-4 at 21, 25).

Grills did not reply to Franzi's requests for clarification, (Docket No. 28-10 at 30), as Franzi had also requested a different contact person due to Grills "making a fool out of [Franzi]," Grills Decl. ¶ 19, (Docket No. 28-10 at 4-5). Grills, instead, referred Franzi to her supervisor, Richard Hrivnat ("Hrivnat"), Director of Human Resources at UPMC Presbyterian Shadyside, on November 5, 2012. (Docket No. 28-10 at 30). Franzi first contacted Hrivnat on December 13, 2012, through an email which stated, among other things, that UPMC's lawyer threatened Franzi and had been untruthful to Franzi regarding her disability. (Docket No. 28-9 at 7).

After several email exchanges, Hrivnat informed Franzi on January 7, 2013 that he could not unilaterally change Franzi's scheduling, because he did not have authority to make schedule or assignment changes outside of his department, without contacting management. (Docket No. 28-4 at 67, 70-79). He offered to discuss her situation with management, but Franzi had asked him not to do this.[38] (Docket No. 28-4 at 67, 70-79). Hrivnat explained that seniority is only one of several criteria evaluated in determining whether to promote or assign jobs. (Docket No. 28-4 at 78). He advised Franzi that Goodman was reviewing Franzi's claim of horizontal violence, and would contact Franzi shortly. (Docket No. 28-4 at 78). He also informed Franzi that she could use the chain of command in her own department. (Docket No. 28-4 at 78).

Previously, on November 21, 2012, Danis had informed Franzi that she would not be considered for a promotion to Manager ("2012 promotion") even before her scheduled interview.

---

[38] Nevertheless, he received an email recommendation from Grills on December 28, 2012, at the request of Goodman, that all of Franzi's complaints be denied. (Docket No. 28-10 at 36-37). Hrivnat also reviewed Grills' investigation notes and conclusions, and discussed these notes with her. Hrivnat Decl. ¶ 8, (Docket No. 28-9 at 3). Hrivnat's Declaration does not further explain with whom he discussed Grills' investigation notes and conclusions, or the time period in which he reviewed same, other than that he undertook his review of the notes and conclusions after December 21, 2012. Hrivnat Decl. ¶ 8, (Docket No. 28-9 at 3).

(Docket No. 28-10 at 39).  Later that day, Danis emailed Grills and Frerk to convey that she informed Franzi that "all applicant resumes were reviewed in addition to performance reviews" and "based on that review, [Franzi] would not be considered for the manager position."  (Docket No. 28-10 at 39).  Instead, Danis decided to promote Nickleach, after consulting with Frerk and the Director of the Kitchen, Gayle Musulin ("Musulin").  Danis Dep. 44:10-22, (Docket No. 28-7 at 13).  Franzi testified that Danis informed her that the number on her performance evaluation precluded her from even being interviewed.  Franzi Dep. 206:9-25, (Docket No. 28-3 at 16).

Danis also testified that she informed Franzi not to apply for the position of Dietician Coordinator ("2013 promotion") because of her existing disciplinary record.  Danis Dep. 45:2-11, (Docket No. 28-7 at 13).  Instead, Danis and Nickleach jointly decided to promote Gannon as the Dietician Coordinator, who would be responsible for managing forty-two individuals on the staff, only seven of whom write TPNs.[39]  Danis Dep. 45:12-46:10, (Docket No. 28-7 at 13-14).

Approximately one month later, Danis sent an email apparently intended for Grills, stating that Franzi was "really on a rampage lately with the email demands and accusations" and "really looking for something to use for ammunition."  (Docket No. 28-4 at 61).  As noted, Grills had already recommended Franzi for termination, as early as September 2011.  Danis Dep. 90:1-26, (Docket No.28-7 at 25).  The December 2012 emails related to Franzi's request that: (1) Nickleach explain why Franzi was still covering three clinicians when Gannon covered only two, and why another clinician with less seniority had received preference over Franzi on ICU assignments, (Docket No. 28-4 at 61-62); and (2) Gannon disclose whether chart reviews were altered before they were handed in, (Docket No. 28-4 at 63).  In her email, Danis requested advice and a meeting.  (Docket No. 28-4 at 61).  This email was wrongly sent to Franzi, who

---

[39] Among the seven TPN team clinicians, UPMC had never established a supervisory position, but it maintained supervision under the Dietician Coordinator and Nutrition Manager.  Danis Dep. 46:11-15, (Docket No. 28-7 at 14).

responded by "forwarding" the email to the "proper resources." (Docket No. 28-4 at 61). On December 18, 2012, Danis held another meeting with Franzi and a witness,[40] despite Franzi's request that the meeting be conducted one-on-one. (Docket No. 28-4 at 65).

Grills then sent to Hrivnak an email on December 28, 2012 recommending that all of Franzi's complaints be denied as unsubstantiated. (Docket No. 28-10 at 36-37). Grills made her recommendation at the request of Goodman. (Docket No. 28-10 at 36). She conveyed that Frerk did not believe Human Resources had been supportive in dealing with these issues and that Nickleach was upset and threatened to seek other employment. (Docket No. 28-10 at 36).

Several days later, on January 2, 2013, Franzi and Keriotis[41] were reviewing patients on the surgical floor, and Keriotis asked Franzi why she had given one of the patients[42] chloride instead of acetate. Franzi Dep. 211:2-16, (Docket No. 28-3 at 18). Rather than providing the reason for giving the patient chloride, Franzi stated "the patient will be fine." Franzi Dep. 211:14-15, (Docket No. 28-3 at 18). Franzi maintains that Keriotis should have known the answer to her question and that Keriotis should have trusted Franzi that the patient would be fine. Franzi Dep. 211:21-25, (Docket No. 28-3 at 18). Thereafter, Keriotis apparently refused to talk to Franzi while they attended to additional patients, after which Franzi said that Keriotis should take two or three patients and write their TPN orders for Franzi to check. Franzi Dep. 213:12-17, (Docket No. 28-3 at 18). Keriotis became very upset and accused Franzi of telling her what to do. Franzi Dep. 213:16-22, (Docket No. 28-3 at 18). Later that afternoon, Keriotis sent an email

---

[40] The name of this witness is not apparent from the documentary materials provided to the Court, which only state that the witness was "from the kitchen who was a friend of hers [Danis]." (Docket No. 28-4 at 65).
[41] Keriotis, as previously noted, was a physician assistant.
[42] The record does not disclose the name of this patient, and UPMC further refused to provide the name of the patient even to Franzi during UPMC's subsequent investigation of this incident and its request for a statement from Franzi. (Docket No. 28-4 at 84-85).

to Danis and Nickleach describing Keriotis' version of what had occurred, and wrote that if Franzi objected to her questions, then Keriotis could not work with her. (Docket No. 28-8 at 20).

Two weeks later, Nickleach called Franzi into a meeting to provide her own version of the January 2, 2013 incident, but Franzi replied that she had to finish her work for all the patients that she had already begun for the day. Franzi Dep. 215:11-217:14, (Docket No. 28-3 at 19). After exchanging several emails concerning whether the name of the patient was necessary for Franzi to make her statement, Nickleach sent an email to Franzi at 4:08 p.m. demanding that Franzi provide Nickleach with her own version of what had taken place between Franzi and Keriotis, by January 17, 2013, the next day, at 9:00 a.m. (Docket No. 28-4 at 80).

Nickleach's email warned Franzi that if she failed or refused to provide a statement or did not directly address the incident, it would be considered a "refusal to cooperate with an internal investigation and [Franzi] will be subject to corrective action up to and including termination." (Docket No. 28-4 at 80). At the time Nickleach sent this email, Franzi had already left for the day, as her shift had ended at 2:30 p.m.[43] (Docket No. 28-4 at 84).

Franzi testified that she saw Nickleach's email on January 17, 2013 at 6:00 a.m., when she began work. (Docket No. 28-4 at 83). Yet, she did not email her statement to Nickleach until 10:16 a.m. (Docket No. 28-4 at 83-85). (Nor did she request an extension. (Docket No. 28-4 at 83)). Twenty minutes after Danis, Nickleach,[44] and Frerk received Franzi's statement, Danis forwarded it to Grills, Hrivnak, and Megan Duffy (legal counsel at UPMC), asking them whether it was a frivolous complaint. (Docket No. 28-4 at 83).

---

[43] Nickleach allegedly frequently emailed Franzi after her shift ended because she knew that Franzi would leave at 2:30 p.m. Franzi Dep. 217:15-218:9, (Docket No. 28-3 at 19).

[44] Nickleach believed that the statement was an "affront" and "actual harassment" of Nickleach, with "blatant disregard for management and authority by choosing to give a harassing statement rather than a statement." Nickleach Dep. 114:1-8, (Docket No. 28-6 at 115).

The next day, Franzi received a memorandum from Frerk indicating that Franzi was "suspended from [her] employment pending investigation into whether [she had] violated UPMC policy," effective immediately. (Docket No. 28-4 at 86). Under UPMC's Corrective Action and Discharge Policy HS-HR0704, "insubordination" and "refusal to cooperate in an internal investigation" can be "considered cause for immediate discharge." (Docket No. 46 at 19). As with her prior warnings, Franzi refused to sign this memorandum. (Docket No. 28-4 at 86).

On February 1, 2013, UPMC completed its investigation and issued a termination letter, signed by Frerk, containing its findings that Franzi's "refusal to comply with [her] supervisor's specific directive and refusal to cooperate with an internal investigation constitutes insubordination and violates UPMC's Corrective Action and Discharge policy, HS-HR0704." (Docket No. 28-4 at 91). UPMC terminated Franzi's employment, effective immediately, and provided no other reason for termination. (Docket No. 28-4 at 91-92).

The decision to terminate Franzi was made by Frerk, Grills, Hrivnak, and UPMC legal. Frerk Dep. 55:17-56:25, (Docket No. 28-5 at 16). According to Frerk, Danis was included as the director in making the decision, but Danis did not recommend termination. Frerk Dep. 56:18-25, (Docket No. 28-5 at 16). Nickleach would not have been involved at this level. Frerk Dep. 57:1-13, (Docket No. 28-5 at 16). Frerk did not provide any verbal explanation or statement of the policies, which Franzi violated, when Franzi was given the memorandum of suspension. Frerk Dep. 54:1-4, (Docket No. 28-5 at 16). Frerk testified that she did not know that Franzi had a disability at the time of termination. Frerk Dep. 57:14-58:10, (Docket No. 28-5 at 16-17). Nor did she obtain Franzi's version of what had occurred between or among Franzi, Keriotis, and Nickleach. Frerk Dep. 55:2-11, (Docket No. 28-5 at 16). Also, she did not review the statement that Franzi provided on January 17, 2013 prior to termination. Frerk Dep. 60:25-61:5, (Docket

No. 28-5 at 17).  She later agreed that Franzi's statement contained information describing her version of what had taken place between Franzi and Keriotis.  Frerk Dep. 61:6-25, (Docket No. 28-5 at 17).  Of note, no one else under Frerk had been terminated for not meeting a timeline to produce a statement, report, or written document.  Frerk Dep. 58:25-59:5, (Docket No. 28-5 at 17).

Frerk testified that she fired Franzi "[b]ased on behaviors that were escalating that were really not acceptable to us throughout the year," and because UPMC "couldn't support any longer her behavior to accuse people that just ask a question of any wrongdoing."  Frerk Dep. 63:22-64:4, (Docket No. 28-5 at 18).  She further testified that "not all [of the] reasons are stated in the letter."  Frerk Dep. 66:15, (Docket No. 28-5 at 19).

Danis maintains that she did not make the termination decision nor was she asked for a recommendation concerning same.  Danis Dep. 114:8-19, (Docket No. 28-7 at 31).  She testified that the reason for termination was "the culmination of years of insubordination, miscommunication, [and] disciplinary action.  That was the straw that broke the camel's back.  That was not a stand-alone incident."  Danis Dep. 112:18-23, (Docket No. 28-7 at 30).  (Counsel for UPMC argued similarly at the Motion Hearing on March 20, 2014.  (Docket No. 40).)

Franzi filed a timely grievance concerning her termination on February 7, 2013.  (Docket No. 28-4 at 93-98).  UPMC responded by letter a month later.  (Docket No. 28-4 at 100).  Judy Molli ("Molli"), Human Resources Manager for UPMC Presbyterian Shadyside, wrote there were no violations or unfair action in management's termination of Franzi based on her alleged refusal to cooperate with an internal investigation, which constituted insubordination.  (Docket No. 28-4 at 100).  In her letter, Molli utilized the following factual findings: (1) Franzi

acknowledged that she was first asked to provide a statement on January 16, 2013 at 9:00 a.m.[45]; (2) she acknowledged receipt of the email requiring such a statement by January 16, 2013 at 4:08 p.m.; (3) she knew that she needed to provide a statement by January 17, 2013 at 9:00 a.m., that failure to do so could subject her to corrective action up to and including termination, and that this deadline provided her with three hours to submit her statement; and (4) she did not request a further extension, and the statement was submitted 1.6 hours[46] after it was due. (Docket No. 28-4 at 100). Franzi was thus terminated by UPMC approximately four months after her complaint in this case in October 2012, (Docket No. 1), and about one year after her filing of her EEOC Complaint in January 2012, (Docket No. 46 at 9).

## II.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Rule 56, a district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

---

[45] This finding was incorrect as Franzi's statement only acknowledges that Nickleach called her around 9:30 a.m., not 9:00 a.m. (Docket No. 28-4 at 84).
[46] This finding was incorrect, as previously noted. Franzi submitted her statement at 10:16 a.m., which is approximately 1.27 hours later than 9:00 a.m. (Docket No. 28-4 at 84).

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.

When a non-moving party would have the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Id.* The moving party need not produce any evidence showing the absence of a genuine issue of material fact. *Id.* at 325. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* After the moving party has satisfied this low burden, the nonmoving party must provide facts showing that there is a genuine issue for trial to avoid summary judgment. *Id.* at 324. "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.*

In considering these evidentiary materials, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks and alterations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. To that end, the Third Circuit has noted that "depositions are 'one of the best forms of evidence for supporting or opposing a summary-judgment motion,' and that affidavits, not being subject to cross-examination, 'are likely to be scrutinized carefully by the court to evaluate their probative value.'" *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006) (quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722, at 373, 379 (3d ed. 1998)). Even inconsistencies within a Plaintiff's deposition may "cast[]

doubt on the plaintiff's story" and "are matters ultimately useful in determining the plaintiff's credibility," but they "are not proper considerations on a motion for summary judgment." *Chatman v. City of Johnstown, PA*, 131 F. App'x 18, 20 (3d Cir. 2005). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

## III.    DISCUSSION

Here, UPMC has set forth several arguments in support of its motion for summary judgment. First, it argues that there was no intentional discrimination because of Franzi's disability. (Docket No. 30 at 4). Second, it avers that Franzi was discharged based on her lengthy history of insubordinate and combative behavior, culminating in her refusal to provide a statement to her supervisor explaining an altercation with another employee. (Docket No. 30 at 9). Third, it maintains that Franzi cannot establish a failure to promote, because she did not file an EEOC charge until January 2012, and her work performance was marginal. (Docket No. 30 at 11-12). In response, Franzi contends that genuine disputes of material fact preclude summary judgment. The Court now addresses each of these arguments, in turn.

### A.    Plaintiff's Discrimination Claim

The Court first evaluates Franzi's claim for discrimination against UPMC under the ADA. The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2014). A "qualified individual with a

disability" includes "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (2014). "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102 (2014). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102 (2014).

Discrimination claims under the ADA are evaluated under the familiar *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, (1973); *E.E.O.C. v. Hussey Copper, Ltd.*, 696 F. Supp. 2d 505 (W.D. Pa. 2010) (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667–68 (3d Cir. 1999)) (applying *McDonnell Douglas* to analyze ADA claims). Plaintiff has the initial burden to establish a prima facie case of discrimination. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007). If the Plaintiff establishes a prima facie case, the burden shifts to Defendant "to articulate some legitimate, nondiscriminatory reason" for its employment decision and, if Defendant is successful, the burden shifts back to Plaintiff to present sufficient evidence from which a reasonable jury could conclude that the employment decision was a pretext for discrimination. *Id.*

"To establish a prima facie case of discrimination under the ADA, a plaintiff must therefore show '(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment

decision as a result of discrimination.'" *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380

F.3d 751, 761 (3d Cir. 2004) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d

Cir. 1999)). "Adverse employment decisions in this context include refusing to make reasonable

accommodations for a plaintiff's disabilities." *Id.* "[A] failure to make a reasonable

accommodation for a disabled and qualified employee constitutes discrimination under the

ADA." *Id.* at 771. "[T]he question of whether a proposed accommodation is reasonable is a

question of fact." *Id.* "Reasonable accommodation further includes the employer's reasonable

efforts to assist the employee and to communicate with the employee in good faith, under what

has been termed a duty to engage in the interactive process." *Id.* at 761 (internal quotation marks

and citations omitted). "[B]oth employer and employee 'have a duty to assist in the search for

appropriate reasonable accommodation and to act in good faith.'" *Id.* at 771 (quoting *Mengine v.

Runyon*, 114 F.3d 415, 420 (3d Cir. 1997)). To that end:

> An employee can demonstrate that an employer breached its duty
> to provide reasonable accommodations because it failed to engage
> in good faith in the interactive process by showing that:
>
> 1) the employer knew about the employee's disability;
> 2) the employee requested accommodations or assistance
> for his or her disability;
> 3) the employer did not make a good faith effort to assist
> the employee in seeking accommodations; and
> 4) the employee could have been reasonably
> accommodated but for the employer's lack of good faith.

*Id.* at 772 (quoting *Taylor*, 184 F.3d at 319-20). A plaintiff must also show that "a reasonable

accommodation was possible." *Id.* "'[B]ecause employers have a duty to help the disabled

employee devise accommodations, an employer who acts in bad faith in the interactive process

will be liable if the jury can reasonably conclude that the employee would have been able to

perform the job with accommodations.'" *Id.* (quoting *Taylor*, 184 F.3d at 317).

UPMC does not dispute that Franzi is a disabled person within the meaning of the ADA or that she is otherwise qualified to perform the essential job functions. (Docket No. 30 at 4). UPMC instead focuses its argument on whether there was a causal connection between Franzi's disability and the alleged workplace harassment.[47] "A claim for harassment based on disability, like one under Title VII, would require a showing that: (1) [Plaintiff] is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [Defendant] knew or should have known of the harassment and failed to take prompt effective remedial action." *Walton*, 168 F.3d at 667.

UPMC also does not contest whether any alleged harassment of Franzi occurred, nor does it present any argument as to whether the harassment was sufficiently severe or pervasive to alter the conditions of her employment or create an abusive working environment. (Docket Nos. 30 at 3; 39 at 2). UPMC only challenges that Franzi suffered intentional discrimination because of her disability. (Docket Nos. 30 at 3, 39 at 2). It avers that none of her supervisors knew of her

---

[47] UPMC also does not challenge whether a claim for hostile work environment exists under the ADA. *See Walton*, 168 F.3d at 666-67 ("This framework indicates that a cause of action for harassment exists under the ADA. However, like other courts, we will assume this cause of action without confirming it because Walton did not show that she can state a claim."); *see also Pallatto v. Westmorland Cnty Children's Bureau*, Civ. No. 11-1206, 2014 WL 836123, *17 (W.D. Pa. Mar. 4, 2014) (citing *Walton*, 168 F.3d at 667) (holding that Plaintiff produced sufficient evidence to survive a motion for summary judgment on the causal connection element of a hostile work environment under the ADA, when the plaintiff was "heavily disciplined for her use of sick time"; her "schedule was modified, requiring her to work at taxing times"; she "was required to obtain approval for all unannounced home visits even though other workers were not"; "her paperwork was returned for correction without adequate time to meet deadlines"; and her supervisor "constantly questioned the legitimacy of plaintiff's impairment and she with [another supervisor] looked for opportunities to discipline plaintiff."). To that end, the Court will assume that a hostile work environment under the ADA exists, given that it has not been disputed by UPMC. The Court is further mindful of the case law establishing the elements of a hostile work environment claim within the context of sex discrimination. "To establish a hostile work environment claim against an employer, a plaintiff must prove the following: (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability." *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). "The first four elements of this claim establish that a hostile work environment existed." *Id.* The fifth element, which determines the basis for an employer's liability, "depends on whether the harasser is the victim's supervisor or merely a coworker." *Id.*

"medical problem" prior to March 2007, when Franzi first took FMLA leave. (Docket No. 39 at 1-2). It does not, however, address the possibility that her supervisors <u>did</u> know or learn about her disability as early as April or July 2007. (Docket Nos. 28-2 at 2, 32-2 at 1). For example, when Franzi first received FMLA leave, Scott-Smith sent an email to Danis on April 19, 2007 stating, "Can't wait to hear … STD?? Mental??" (Docket No. 32-2 at 1).

Furthermore, when Franzi returned from her first FMLA leave, both Danis and Scott-Smith improperly received her return-to-work authorization form, which stated that she had been treated at WPIC[48] in the "Mood and Anxiety Intensive Outpatient and Partial Programs." (Docket No. 28-2 at 2); Danis Dep. 26:24-27:17, (Docket No. 28-7 at 9). After Franzi filed a complaint with UPMC Corporate Compliance asserting a HIPAA violation, the Corporate Compliance official determined that it was <u>not</u> UPMC's responsibility, but UPMC WorkPartners' responsibility. Franzi Dep. 42:23-43:8, (Docket No. 28-1 at 16). However, when Franzi contacted the director of UPMC WorkPartners, Franzi was informed that UPMC was "in transition," so Human Resources still had her papers. Franzi Dep. 43:8-19, (Docket No. 28-1 at 16). Franzi again spoke with Human Resources, after which they stated they would red flag her papers to make sure no one saw them, but this assurance occurred only after the damage had been done. Franzi Dep. 43:19-23, (Docket No. 28-1 at 16). Franzi then received numerous disciplinary write-ups and warnings from Danis from 2008 through 2013, even though Danis already knew that Franzi had sought treatment of her disability at WPIC. Franzi also took several additional leaves of absence in 2008, 2009, 2011, and from July 20 until October 20, 2012, as well as many days of intermittent leave, (Docket No. 29 at 4), all of which were approved by UPMC, (Docket No. 46 at 3-13). Given these circumstances, a reasonable jury could conclude that Danis and others knew of Franzi's disability, beginning as early as 2007.

---

[48] WPIC, as noted, is shorthand for Western <u>Psychiatric</u> Institute and Clinic.

Moreover, Franzi's attorney sent a letter, dated July 6, 2011, to UPMC Human Resources containing seven workplace accommodation requests. (Docket No. 28-2 at 5). Franzi's physician, Dr. Alexandra Kreps, also sent UPMC a letter, dated July 5, 2011, requesting accommodations for Franzi, including that: (1) she be placed on a four day, ten-hours-per-day schedule; (2) she be placed in a calm and supportive working environment; and (3) any concerns about her work be addressed by only one person rather than a group of people. (Docket No. 32-2 at 2). In response, UPMC WorkPartners sent a follow-up questionnaire to Dr. Kreps on July 29, 2011, (Docket No. 32-2 at 3), after which it failed to respond or otherwise discuss Franzi's accommodation requests with Franzi, her attorney, or her doctor, despite several instances of follow-up correspondence from her doctor. (Docket No. 32-2 at 1-4). Accordingly, a reasonable jury could find that UPMC failed to engage in the interactive process. *See Williams*, 380 F.3d at 761.

Franzi also wrote to Grills about her workplace accommodation requests in her July 2011 email.[49] Yet, Danis testified that she had never seen Franzi's July 6, 2011 accommodation requests nor did she speak with Goodman or an in-house attorney about these requests.[50] Danis Dep. 29:15-30:6, (Docket No. 28-7 at 9-10).

UPMC provides no support for its inability to support a four day, ten-hours-per-day work shift, other than Danis' deposition testimony.[51] Further, UPMC provides no documentary support for Danis' testimony that Franzi could not be staffed on three ICUs or that her staffing was equivalent to the ICU staffing of other clinicians. Danis Dep. 42:18-44:4, (Docket No. 28-7

---

[49] Franzi had sent an email to Grills thanking Grills for the chance to meet with her and referencing her workplace accommodation requests on July 28, 2011. (Docket No. 28-2 at 121).

[50] Nickleach similarly testified that she did not recall any specific meetings with Human Resources or WorkPartners concerning Franzi's request to end horizontal violence by her co-workers. Nickleach Dep. 20:17-21:5, (Docket No. 28-6 at 22).

[51] Frerk never considered Franzi's request for a four-day, ten-hours-per-day workweek nor did she consider offering to transfer Franzi from the Presbyterian campus to the Shadyside campus, where the corresponding Manager of Nutrition was Jennifer Wilson. Frerk Dep. 11:17-12:2, 26:3-27:7, (Docket No. 28-5 at 4, 9).

at 13). Franzi, by contrast, maintains that she was often assigned to work four or five ICUs while other clinicians worked only three ICUs. (Docket No. 28-2 at 7). Finally, UPMC did not provide a reason as to why Danis, as Franzi's next level supervisor, could not conduct her performance reviews, nor did it explain why her performance reviews could not be conducted one-on-one, or with a higher-up supervisor.[52]

Based on the foregoing, this Court finds that a reasonable jury could conclude that UPMC did not act in good faith in searching for an appropriate reasonable accommodation in response to Franzi's requests for same. *See Williams*, 380 F.3d at 771 ("[B]oth employer and employee 'have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.'"). Franzi has presented at least circumstantial evidence that a genuine dispute of material fact exists as to whether Franzi would have been able to perform her job with her requested accommodations. *See id.* ("[T]he question of whether a proposed accommodation is reasonable is a question of fact."). Thus, UPMC's argument does not prevail at this stage. *See id.* ("As we have noted, a failure to make a reasonable accommodation for a disabled and qualified employee constitutes discrimination under the ADA.").

### B.      Claim for Retaliation

Turning next to Franzi's claim for retaliation, UPMC maintains that Franzi was "discharged for her a [sic] lengthy history of insubordinate and combative behavior, culminating in her refusal to respond to a reasonable request from her supervisor to provide a statement explaining an altercation with another employee." (Docket No. 30 at 9). "[I]n order to establish a prima facie case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show: '(1) protected employee activity; (2) adverse action by the employer either after or

---

[52] Nickleach did not recall any other employees for which Human Resources presence was necessary to conduct their performance review. Nickleach Dep. 57:1-3, (Docket No. 28-6 at 58).

contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Williams*, 380 F.3d at 759 (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)). "Under the *McDonnell Douglas* paradigm, the employee bears the initial burden of establishing a prima facie case of retaliation." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). "If the employee establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse employment action." *Id.* "If the employer meets its burden, the burden of production returns to the employee, who must now show, by a preponderance of the evidence, that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)).

"[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Marra*, 497 F.3d at 302. "Conversely, however, '[t]he mere passage of time is not legally conclusive proof against retaliation.'" *Id.* (quoting *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993)). "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening

period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole." *Id.* (citing *Woodson*, 109 F.3d at 921 (finding sufficient causal connection based on "pattern of antagonism" during intervening two-year period between protected activity and adverse action)); *Fuentes*, 32 F.3d at 764 (citing *Logue v. Int'l Rehab. Assocs., Inc.*, 837 F.2d 150, 155 (3d Cir. 1988)) ("[T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons, was either a post hoc fabrication or otherwise did not actually motivate the employment action.").

UPMC argues that Franzi has not proven that her alleged disability or protected conduct was the "but for" cause of her discharge. (Docket No. 30 at 8). UPMC also contends that it has articulated a legitimate non-discriminatory reason for her termination, i.e., her lengthy history of insubordinate and combative behavior. (Docket No. 30 at 9). UPMC further maintains that Franzi never complained of disability discrimination to Human Resources or management; no one knew of the July 2011 letter from her attorney requesting accommodations; no one said anything about her EEOC charge and this Complaint to her; and that there is no evidence of any difference in treatment of her and her co-workers. (Docket No. 30 at 11).

At the outset, even though UPMC may have terminated Franzi because of her allegedly lengthy history of insubordinate or combative behavior, this reason was not set forth in the memorandum suspending Franzi pending investigation. (Docket No. 28-4 at 86). Nor did UPMC include such reasons in Franzi's termination letter. Rather, it stated that Franzi's "refusal to comply with [her] supervisor's specific directive and refusal to cooperate with an internal

investigation constitutes insubordination and violates UPMC's Corrective Action and Discharge policy, HS-HR0704," (Docket No. 28-4 at 91-92). Specifically, the termination letter referred to Franzi's refusal to provide a statement to Nickleach on January 16, 2013 to address the disagreement between Franzi and a Physician Assistant, and she did not provide the statement by 9:00 a.m. the following day, as Nickleach specifically directed her to do so in an email sent at 4:08 p.m., which further advised that any failure to do so would subject her to corrective action up to and including termination. (Docket No. 28-4 at 91). Franzi was thus terminated on the basis of an email report that was one hour and sixteen minutes late. (Docket No. 28-4 at 91).

The decision to terminate Franzi was made by Frerk, Grills, Hrivnak, and UPMC's legal team. Frerk Dep. 55:17-56:25, (Docket No. 28-5 at 16). According to Frerk, Danis was included as the Nutrition Director, but Danis states that she did not recommend termination. Frerk Dep. 56:18-25, (Docket No. 28-5 at 16). Nickleach, as previously noted, was not involved. Frerk Dep. 57:1-13, (Docket No. 28-5 at 16). When Franzi was given the memorandum of suspension, Frerk did not provide her with any verbal explanation or statement of the policies that she was accused of violating. Frerk Dep. 54:1-4, (Docket No. 28-5 at 16).

Frerk did not obtain or seek Franzi's version of what had occurred between or among Franzi, Keriotis, and Nickleach. Frerk Dep. 55:2-11, (Docket No. 28-5 at 16). She did not review the statement that Franzi had provided on January 17, 2013 at 10:17 a.m. prior to the termination. Frerk Dep. 60:25-61:5, (Docket No. 28-5 at 17). She also apparently did not know that Franzi had a disability at the time of termination. Frerk Dep. 57:14-58:10, (Docket No. 28-5 at 16-17). Yet, she later agreed that Franzi's statement contained information describing her version of what had taken place between Franzi and Keriotis. Frerk Dep. 61:6-25, (Docket No.

28-5 at 17).  No one else under her had been terminated for failing to meet a timeline to produce a statement, report, or written document.  Frerk Dep. 58:25-59:5, (Docket No. 28-5 at 17).

After Franzi was terminated, Frerk testified that it was "[b]ased on behaviors that were escalating that were really not acceptable to us throughout the year" and because UPMC "couldn't support any longer her behavior to accuse people that just ask a question of any wrongdoing."  Frerk Dep. 63:22-64:4, (Docket No. 28-5 at 18).  Frerk also testified that "not all [of the] reasons are stated in the letter."  Frerk Dep. 66:15, (Docket No. 28-5 at 19).  Danis testified that the termination was based on "the culmination of years of insubordination, miscommunication, [and] disciplinary action.  That was the straw that broke the camel's back.  That was not a stand-alone incident."  Danis Dep. 112:18-23, (Docket No. 28-7 at 30).

If these reasons were the actual cause for termination, however, they could have easily been included in the memorandum of suspension or the termination letter.  Further, UPMC provides no explanation as to why its own internal investigation over the course of two weeks could not have produced a more comprehensive termination letter that documented the "years of insubordination, miscommunication, [and] disciplinary action," to which Danis alludes.  Danis Dep. 112:18-23, (Docket No. 28-7 at 30).  Nor did it provide these reasons in its factual findings, dated March 7, 2013, in response to Franzi's grievance letter. (Docket No. 28-4 at 100).

Moreover, to the extent that UPMC asserts that Franzi had received a final warning on September 12, 2011, (Docket No. 38 at 3), UPMC is incorrect in its stance because Franzi's September 12, 2011 warning was a "Written Warning in Lieu of a 5 Day Suspension," (Docket No. 28-2 at 111-15).  This warning listed Franzi's prior warnings dated September 5, 2008, November 11, 2008, May 29, 2009, and March 9, 2010.  (Docket No. 28-2 at 111).  It also stated that failure to demonstrate immediate and sustained improvement or further violations could lead

to termination from employment pursuant to HS-HR0704, Corrective Action and Discharge, but it did not state that termination was the next step nor did it disclose that it was a final written warning vis-à-vis the one Franzi received on March 19, 2010.  (Docket No. 28-2 at 111).  Danis further acknowledged that Franzi's March 19, 2010 Final Written Warning would have expired after eighteen months, or on September 19, 2011.  Danis Dep. 89:9-13, (Docket No. 28-7 at 24).

Danis was also the initial supervisor who conducted Franzi's performance reviews. (Docket No. 32 at 2).  Starting in 2009, Nickleach began conducting her reviews.  (Docket No. 32 at 2).  Even though Franzi received substantially lower scores of 2.22 in March 2008 and March 2009 than her rating of 2.58 in March 2006 and her rating of 2.48 in March 2007, those ratings corresponded to "consistently meets expectations."  (Docket Nos. 28-2 at 10, 18, 37; 43-2 at 1, 8).  And in September 2010, 2011, and 2012, Franzi continued to receive overall ratings of 2, which corresponded to "Solid, Strong, Good Performer."[53]  (Docket Nos. 28-2 at 61, 71, 82).

Given (1) the inconsistencies between UPMC's proffered reasons for her termination, i.e., Franzi's alleged lengthy history of insubordinate and combative behavior, and the reasons listed in her suspension memorandum and termination documents, (Docket No. 28-4 at 86, 91-92); (2) the fact that Franzi's written warning in September 2011 did not state that it was a final warning along the lines of her prior final warning in March 2010; and (3) the fact that she continued to receive performance review scores of "Solid, Strong, Good Performer" from 2008 through 2012, (Docket Nos. 28-2 at 18, 37, 61, 71, 82), a reasonable jury could discredit UPMC's proffered reasons for Franzi's termination as a post hoc rationalization.  *See Fuentes*, 32 F.3d at 765 ("[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities,

---

[53] Grills affirmed that Franzi was rated a marginal performer, Grills Decl. ¶ 21, (Docket No. 28-10 at 5), but her declaration is incorrect, as Franzi's overall rating was "Solid, Strong, Good Performer" throughout 2010-2012. (Docket Nos. 28-2 at 61, 71, 82).  Franzi received ratings of marginal performer only within certain subcategories of her performance reviews throughout this period. *Id.* at 53-83.

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"). UPMC's Motion for Summary Judgment on Franzi's retaliation claims is, therefore, denied.

### C. Failure to Promote Claims

Franzi finally alleges that she was denied three promotions due to her disability:

- A 2007 promotion for Dietician Coordinator;
- A 2012 promotion for Nutrition Manager; and
- A 2013 promotion for Dietician Coordinator.

(Franzi Dep. 68-69, Docket No. 28-1 at 22). UPMC avers that Franzi did not file a charge with the EEOC until 2012, more than 300 days after the 2007 promotion, making this claim untimely, (Docket No. 29 at 14), and that her performance reviews precluded her from being considered for the 2012 and 2013 promotions, (Docket No. 28-10 at 5, 39). Franzi raises no argument, in response, other than a reference to the continuing violation doctrine. (Docket No. 32 at 11).

"Under the *McDonnell Douglas* paradigm, an employee must first establish a prima facie case of discrimination, after which the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." *Walters v. Norton*, 326 F. App'x 644, 649 (3d Cir. 2009) (quoting *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005)). "The presumption of discrimination established by the plaintiff's prima facie case drops out of the picture once the defendant meets its burden of production." *Id.* (internal quotation marks omitted). To survive summary judgment, "the plaintiff generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762.

Turning first to the 2007 promotion, Plaintiff relies on the continuing violation doctrine, but she does not provide any authority in support. (Docket No. 32 at 11). "Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). However, "[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

"A discrete act in itself constitutes a separate actionable unlawful employment practice." *Id.* "Discrete acts include, for example, 'termination, failure to promote, denial of transfer, or refusal to hire.'" *Id.* at n.1 (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114) ("Mandel does not appeal the District Court's correct determination that her claim alleging failure to promote in 2006 was a discrete act that was time barred because it occurred prior to February 18, 2007 (i.e. 300 days prior to the filing of the Charge on December 14, 2007).").

Thus, the continuing violation doctrine does not apply to the 2007 promotion, which is a discrete act, and the Court grants UPMC's motion for summary judgment as to same. *See id.* (citing 42 U.S.C. § 2000e-5(e)(1)) ("To bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice."). The Court also grants UPMC's motion for summary judgment on the 2012 and 2013 promotions, because Franzi presents no argument in her filings,[54] (Docket Nos. 32, 35), or at oral argument, (Docket No. 40), concerning these two promotions.[55]

---

[54] Pursuant to Local Rule 56, "[t]he memorandum of law in opposition to the motion for summary judgment must address applicable law and explain why there are genuine issues of material fact to be tried and/or why the moving party is not entitled to judgment as a matter of law." Yet, Franzi did not raise any argument concerning her failure to promote claims in her Brief in Response to UPMC's Motion for Summary Judgment, (Docket No. 35), and she

## IV.    CONCLUSION

For the aforementioned reasons, UPMC's Motion for Summary Judgment with respect to Plaintiff's claims for failure to promote shall be granted, as Plaintiff presented no argument with respect to the 2012 and 2013 promotions, and Plaintiff's argument concerning the 2007 promotion is untimely.  *See Mandel*, 706 F.3d at 165.  Plaintiff's claims for discrimination and retaliation under the ADA, however, remain viable at this time, and Defendant's Motion for Summary Judgment is denied, in all other respects.  Thus, this case shall be set down for trial.

An appropriate Order follows.

<u>s/ Nora Barry Fischer</u>
Nora Barry Fischer
United States District Judge

Date:   September 4, 2014
cc/ecf:  All counsel of record

---

admitted all of UPMC's facts in support of same, other than her reference to the continuing action doctrine, (Docket No. 32), as previously noted.  In her brief, she also states that "Plaintiff concedes that many of the material facts as described by Defendants are not in dispute, as per the many concise factual statements that plaintiff has admitted." (Docket Nos. 32 at 11-12, 35 at 2).

[55] In its briefing, UPMC relied on two primary arguments, which Franzi did not dispute: (1) Nickleach and Gannon were more qualified based on their "global" experience; and (2) Franzi's marginal performance evaluation ratings and disciplinary write-ups precluded her from consideration.  (Docket No. 29 at 15).